[Crim. No. 3524. In Bank.—July 25, 1932.]

THE PEOPLE, Respondent, v. ALBERT FULLER, Appellant.

Strother P. Walton for Appellant.

U. S. Webb, Attorney-General, J. Charles Jones, Deputy Attorney-General, and Mason A. Bailey, District Attorney, for Respondent.

SEAWELL, J.—The defendant, Albert Fuller, was convicted in the Superior Court of the County of Madera, of first degree murder. The jury did not relieve him of the extreme penalty of the law and his punishment being fixed in such cases by the law, the court accordingly sentenced him to suffer the death penalty. The person murdered was J. W. Kipp, commonly known in the section wherein he resided as "Jim" Kipp. The crime was committed October 8, 1931. Kipp's father was of the white blood and his mother was a California Indian. He was forty-eight years of age at the time he met his death by drowning in a mine shaft and had many years prior thereto suffered the loss of his right leg. By trade he was a shoe repairer. He used a crutch to assist him in locomotion. It seems that the deceased had spent the most, if not his entire life, in the county of Fresno and counties contiguous thereto and had been somewhat successful in his business, which, primarily, was that of conducting a shoe repairing business. His disappearance from the locality in which he resided under unusual circumstances caused a search to be organized which resulted in the discovery of his body on October 15, 1931, in a mine shaft of the old Wagner mine, which shaft was two hundred feet deep, the lower one hundred feet of which was filled with water. Said mining grounds were located in an isolated mountain district of Madera County. The nearest approach of a traveled way to said abandoned shaft was one and one-half miles distant. The dimensions of the shaft at its mouth were six by seven feet. Five feet below its surface it narrowed to three by four feet, but lower down it widened again. By reason of the uneven and broken surface of the locality the mouth of said shaft was not readily discernible until one approached within twenty feet of the opening. The locality gave evidence of earlier mining activities and "dumps" from the mine clearly

marked the locality as the site of a former mining enterprise.

The defendant, his wife Marjorie Fuller, and the deceased had been mutually acquainted for a period of some five years. This acquaintance began at Big Creek, Fresno County, where the deceased had conducted a shoe repairing business before he became acquainted with Fuller. Kipp had also known Marjorie Fuller at Big Creek and at the city of Fresno before Fuller had made her acquaintance. It seems that prior to her marriage with Fuller, which took place less than five years before the death of Kipp, she had been employed in restaurant and hotel work at Fresno and outlying villages. The defendant at the time he became acquainted with the deceased Kipp was working for the Southern California Edison Power Company. He was so employed for about one year, when, according to his own admission, he had engaged in selling whisky for a period of three years in and about Big Creek. In this he claims Kipp joined him. This relationship, according to defendant's story, continued until he and Kipp bought a general merchandise business at the village of Seville, Tulare County, in October, 1930. Upon the purchase of said business defendant Fuller applied for and was appointed postmaster of the village. Kipp seemed to have been engaged to the time of said purchase in conducting a shoe repairing business and attending to other business affairs. The defendant, his wife Marjorie, and Kipp, after the purchase of said business lived at the same house located near the store until July 25, 1931, on which day the wife left Fuller and went to Fresno, which circumstance will be referred to as this opinion progresses. Fuller testified that he and Kipp frequently disagreed as to the management of said merchandise business. Kipp was presumably engaged in the shoe repairing business and seems to have attended to the financial business of the partners. Fuller was more active in the sales department. Some time after the business was taken over, the exact month does not appear in the record, Fuller and Kipp obtained three policies of fire insurance. Whether said policies were issued through the solicitation of Fuller or Kipp or both does not appear. John C. Herring, the agent of the company which issued the policies, referred to them in the procurement of said insurance merely as Al. Fuller and J. W. Kipp. The policies

ran to said partners in the order named. These policies were issued in the following amounts: On stock, $2,000; on shoe equipment, $1,000; on Frigidaire, $500; total, $3,500. On September 19, 1931, said store and its contents, including the shoe repairing department, were destroyed by fire.

The fact that Fuller had allured Kipp to the mine shaft in a lonely district to accomplish the thing which actually happened was, in all probability, divulged by his wife, who was not called as a witness, to the officers of the law. This conclusion is suggested by the fact that Fuller and his wife began to consort together immediately after Kipp disappeared and he admitted at the trial that he told his wife of the incident which resulted in Kipp losing his life immediately thereafter and she advised him to keep the matter a secret. Upon being arrested on the third day following the commission of said crime at the home of his friend Eaton by the sheriff of Fresno County, W. H. Collins, in explanation of his arrest he said to Eaton, as he was leaving with the sheriff, "Well, I think I know what it is about, it serves a man right for trusting a woman." There were, however, other circumstances which placed Kipp, when last seen, in company with Fuller, going in the general direction of the shaft from which Kipp's body was recovered four days after Fuller's arrest and seven days after Kipp's death, at a depth of one hundred feet, floating among waterlogged timbers at the water line. The facts briefly stated in this respect are that Kipp and Fuller were seen to leave Seville in Kipp's Victoria Studebaker six automobile on October 8, 1931, at approximately 10:30 A. M. going westerly. Kipp was driving the car. They reached Raymond between 2:30 and 3 o'clock P. M. and bought three gallons of gasoline. They then entered a restaurant and ice-cream parlor and ordered sandwiches. Fuller called for two glasses and said to the attendant that he had what he wished to drink with him. He produced a bottle from his pocket containing whisky and several rounds of drinks were had. This he admitted as a witness. He was seen upon his return passing through Raymond and going in the general direction of Fresno at 5 or 5:30 P. M., alone and driving Kipp's Studebaker car. At about 10 o'clock that night he drove into Lounsbury's garage at Merced in Kipp's Studebaker and left the next morning, October 9th, at 7 o'clock. At 5:30 P. M. of the same

day Kipp's car was stored at a Modesto garage and was checked out at 8:30 the next day. On that afternoon, October 9th, the defendant drove into another garage in Merced—Thorington's—at 3:30, in his own car, an Oldsmobile, and left at 9 o'clock that night. On October 10th, at 2 P. M., defendant's Oldsmobile was stored at Modesto and checked out the following morning at 8:30. The garageman in this instance would not undertake to identify the defendant as the man who stored said car for the night. As to said automobiles being cars personally owned or under the control of Kipp and Fuller respectively there is no dispute. Each garage owner kept records of the license numbers and descriptions of said cars as they were shifted from one garage to another. Nor is there any doubt as to the identity of the defendant with the storage of said cars as described by the several garage owners. On October 10th the defendant arrived at the Auditorium garage at Oakland in Kipp's Studebaker car, represented himself as J. W. Kipp, who was the registered owner of the car, made arrangements for the storage of said car for a year at the rate of four dollars per month, paid one month's storage in advance in the name of J. W. Kipp and took the name and address of the garage for future reference in case he wished to withdraw said car at the end of the first month. He told the garage owner that he was going north and departed. The sheriffs and deputy sheriffs and other officers of Fresno, Tulare and Madera Counties gathered such information as justified the filing of a charge of murder against the defendant and he was placed under arrest by Sheriff Collins on Sunday, October 11, 1931. When interrogated by the officers he said he was uncertain as to the last time he saw Kipp, but he finally decided that it was October 8th. He and Kipp drove into Fresno from Seville in Kipp's Studebaker and before reaching Fresno the latter remarked that he had an appointment with a man named Johnson at a designated street corner in Fresno. They parked Kipp's car and upon Johnson's arrival in his car the three entered Kipp's car and proceeded to the place of a bootlegger named Sam, where they had a few drinks, and returned to the place where Johnson had parked his car; whereupon he, Fuller, left the party and went to get his car, which was being repaired by a man named Statham. He placed the time he left Kipp at noon, but

later changed the hour to possibly 2 o'clock P. M. In the presence of Sheriff Overholt, Sheriff Hill, Sheriff Rhodes, Sheriff Collins and Deputy Sheriff Tarr, he also stated that Kipp and the mysterious Johnson left him at Fresno, each in his own car driving toward San Francisco, and he believed that Kipp had gone to San Francisco to enter into a liquor transaction with Johnson. He could not name anyone in Fresno who was acquainted with Johnson except himself and Kipp. Later, in accounting for the absence of his friend and former partner he offered the theory that inasmuch as a divorce was pending between himself and his wife and there was some probability that Kipp, by reason of the friendship which existed between them, would be called as a witness on his behalf and as Kipp did not care to testify in the case he would be absent for two or three weeks. He said that he and Kipp were friendly. When it was suggested that Kipp might be dead or injured he made the assuring reply that Kipp would show up in a couple of weeks; he would come back; he would walk right in and everything would be all right. He regarded Kipp's absence, in some strange fashion, as a friendly act on the part of Kipp. As additional reasons supporting his grim optimistic prediction that the man known by him to be dead would soon return, he said he was absent partly on business and partly because he did not want to get mixed up in his divorce action. Upon arriving at Madera in the company of the officers they were met by two members of the Fresno police department who had in their possession a suitcase which Fuller identified as his property. It contained, among other articles of clothing, a pair of trousers from which were taken four keys which were identified as keys belonging to Kipp. Two of them were keys to his safe deposit boxes. Fuller said that they were keys to his safe deposit boxes, but the bank officials identified said keys by their records as having been issued to and used by Kipp, one of which was issued long before Fuller ever knew Kipp. Fuller never had had access to Kipp's safe deposit boxes and he never presented himself to the bank as a person who had such a right. Fuller did not attempt to show that he had a safe deposit box at any time. On October 13th Fuller was taken to Modesto and asked to point out the hotel to which he had stated he had gone to meet a woman from Seville on the night of October 10th,

and after meeting her had registered under the name "J. E. Spears, San Francisco". Upon arriving at Modesto he refused to talk further, acting upon the advice of counsel, but the officers located the hotel and inspected his registration, which appeared upon the hotel register in the manner above set forth. From the suitcase identified by Fuller as his property there was taken a shirt which he admitted belonged to him. This shirt had been recently washed, but still showed stains upon it. The stains were submitted to a chemist for examination and were pronounced by him to be stains made by human blood.

The day following the death of Kipp, October 9th, Fuller appeared at the office of John C. Herring, the insurance agent who had issued the policies of insurance against loss by fire upon the stock and fixtures of the store, a Frigidaire, and the shoe-repairing equipment, property of the partnership, amounting to $3,500, with a man whom he introduced as Mr. Johnson. Fuller presented a purported executed assignment by Kipp of all his interest in the moneys due or collectable upon said policies, to Fuller. Johnson made an affidavit in which he averred that he witnessed the signature of Kipp to said purported assignment of his interest in said policies to Fuller. The assignment was acknowledged by Herring, who was also a notary, and delivered to Fuller. The assignment was not produced at the trial or accounted for by Fuller, notwithstanding his attempted explanation from the witness-stand that about a week before the death of Kipp, the latter had spoken to him, Fuller, about assigning his claim to the insurance money for the purpose of hiding his assets from his creditors. Johnson was not produced at the trial nor was any evidence given which had a tendency to establish his identity in the smallest degree. A demand to produce the alleged assignment for inspection was not complied with.

The foregoing is a fair statement of Fuller's attempts to account for the absence of his partner and explain his connection with him on the day when Kipp was last seen alive. The record contains other incriminatory acts which we shall not pause to narrate. All that has been related to the present time occurred or was discovered prior to the day on which it became known that Kipp's body was in the mine

shaft, to wit, October 15th, seven days after it had been cast into the shaft.

An inspection of the rocks and soil immediately in the proximity of the mouth of the shaft revealed splashes of dry blood upon rocks and upon weeds and grasses. A chemical analysis of these blood spots showed that they were human blood spots. The body, when drawn to the surface, showed a laceration over each ear about an inch long and a laceration about three inches in length above the center of the forehead extending to the skull. About an inch above the outer corner of the left eye there was a puncture wound, described by the autopsy physician as being about the size of a person's little finger and a little bit jagged on the edges. The instrument which produced this wound entered to a depth of approximately three inches and ended at the cavity of the right jaw-bone. The doctor did not think any of the wounds would produce immediate death. The lungs were filled with water, which would indicate that death was immediately caused by drowning. The walls of the shaft were not exactly perpendicular and a body dropped from the opening would likely touch the sides in its descent. Ledges of rock in certain places projected from the walls to the extent of a foot and a half. The body had other less important bruises upon it in addition to those specifically described. It seems to have been the theory of the prosecution that the deceased was struck with a miner's pick or some other sharp pointed instrument which rendered him unconscious and his body was then cast into the shaft. Fuller owned a half interest in a mining claim which he had worked, in close proximity to the old Wagner mining shaft in which Kipp's body was discovered. He had been at his mining claim many times but denied that he had ever before seen or known of the old abandoned Wagner mining grounds. Slight reference was made to spikes, which were not described, in one corner of the shaft to which some apparatus was attached. This subject was not specially stressed in the evidence.

The defendant took the witness chair in his own behalf. After having heard the case made against him at the trial and recognizing that his first plan of defense had absolutely broken down with the discovery of Kipp's body, he boldly branded all that he had told the officers with respect to Kipp's movements and alleged plans, in the hope of dis-

couraging further investigation, as "lies". He said there was no truth in what he had said.

His testimony in attempting to establish his second plan of defense is so fraught with inconsistencies and contradictions by other evidence and is so definitely overthrown by the facts and by reason as to render it of no greater strength than was his original abandoned plan of defense.

His account of the manner in which Kipp lost his life, putting out of consideration his cunningly planned attempt to possess himself of Kipp's property, is so far out of joint with all reasonable probabilities as to bring it into the realm of absurdities. Conflicting statements run through his professions of friendship for Kipp. At the particular time when he sought to make it appear that Kipp had stolen his wife's affections and that whatever happened to Kipp was a casualty brought about by his resisting a deadly assault made by Kipp with the intent of killing him in order that Kipp might possess himself of Fuller's wife, he was engaged in procuring a divorce from her and she had cross-complained against him. A divorce seemed reasonably certain. He stated that the trip was proposed by Kipp, who told him that he had a load of whisky cached in the mountains, and he went to assist in loading it into the automobile. He stated that Kipp had taken a number of drinks from his bottle and insisted on more and he said to him that he did not want to get too drunk, and he thought he had enough. Kipp replied that he could drink Fuller drunk any time and Fuller acceded to the statement. Upon arriving at the locality where the liquor was supposed to be hidden, Fuller said, "Well, let's go and get it and get back home, go back to Fresno," and Kipp said, "Why is it you want to go back to Fresno; I suppose you want to go back to see Marjorie?" "And I says, 'Jim, you are getting pretty drunk', and I says, 'You have had enough to say about Marjorie now', and I says, 'What her and I does is none of your business; you have nothing to do with it, now, and let's quit talking about it and get this whisky and go to Fresno. . . . ' He says, 'We will go down this trail and get it', and we got out of the car and crossed a barbed wire fence and we started down this trail and walked something like twenty steps and Jim turned around all at once and says, 'You dirty son-of-a-bitch, I will see that you do not get back to Fresno to see Mar-

jorie', and he had a gun in his hand, and I struck that gun with this left hand and hit him right in the nose with the right hand, and the blood flew out of his nose and the gun fell to the ground and I started to reach down to pick the gun up, and as I did Jim sprang back with his crutch [illustrating] and he got overbalanced and fell right into the hole, and that is the way this Jim Kipp went into the mine shaft.''

He said that he did not hear anything of Kipp after he went into the shaft. He claimed that he called three or four times but heard no sound and after five minutes he picked up the gun, went back to the car and drove into Fresno. On the way back he thought he would notify the sheriff at Madera but changed his mind and went to Fresno and called Marjorie over the phone and she met him and he told her what had happened. He informed her he was going to tell the sheriff of Fresno County but she said to him he would have to explain why he went to the mine and she advised him not to tell it. He offered as another reason for keeping the matter secret that he did not want to disgrace his wife's name by making public what had taken place between Jim and his wife and they agreed to say nothing about the matter. At this very moment there was on file in the county clerk's office of Fresno County a complaint verified by Fuller, asking for a divorce from his wife in which he charged that ''The defendant has, without reason or cause, on various occasions, left the home of plaintiff and defendant, and has made extended visits in Fresno and other places, where she stayed at hotels in a drunken condition, and consorted with various men, some known to plaintiff and some unknown to plaintiff, and has appeared with such various men in public places, at late hours at night, in a drunken condition.''

Kipp's hat and crutch were both in the shaft with the body. Upon his person was found a bill of sale and other papers of business import. His watch was found in his trouser pocket. His key ring containing four keys, two of which unlocked his safe deposit boxes, were afterward found in the possession of Fuller.

The defendant offered in evidence a letter produced by him which he claimed was in his wife's handwriting. The letter was addressed to Kipp at Visalia and was dated Fresno, July 27, 1931. Fuller's wife left him July 25th

and was driven from her home at Seville to the Rolland Hotel at Fresno by Kipp on that day. It would be strange indeed if Fuller did not, as he claims, know that his wife was to leave him at the time in question. Seville is a village of some seventeen or eighteen houses. The home of Fuller and Kipp was about one hundred yards from their store. Fuller was at the store at the time his wife took her departure in daylight. An employee of the partnership drove the company's truck in which the wife's trunk was carried to Visalia. Fuller's effort at the trial was to make it appear that Kipp was on affectionate terms with his wife and therefore it was not improbable that he would have made the deadly assault upon him in the manner related by Fuller at the trial. Fuller's explanation as to how his wife's letter to Kipp came into his possession was, first, that he found it, and on cross-examination he said that he took it out of Kipp's coat pocket. He claimed that he charged Kipp with receiving said letter but Kipp denied it and he read the letter to Kipp and the latter replied that he thought "maybe Marjorie was drunked up when she wrote it". Said letter began, "Dearest Friend Jim", and related what the lawyer she had engaged in her suit for divorce had told her. She requested that he loan her $20 or $25 to pay the costs and said, "I will sure pay you back some how, some way when I possibly can. I told Thusen [her attorney] that you would be in Wednesday night, and I would try and have the money then. . . . So dearest if you will please let me have it Wednesday night when you come in. I will sure pay you back some way or some how. And you never will be sorry . . . I am so lonesome and I am afraid to go out much if he is coming to town today or tomorrow . . . I have no one to talk to and nothing to look forward to only you dear. How true it is what people say. That I depend on you. I guess I do all right honey. Don't you think so. But you sort of like me to don't you, dear? . . . But I am so lonesome I just wanted to talk to you and this is the only way I can is on paper. Dearest I will look for you between 10 & 10:30 Wednesday night. So by by dearest until then . . . You can tell me all about Al. when I see you so wont ask about him now." The letter closed with the request that he bring her sewing basket, needles and other domestic articles. No written

communication of any kind addressed by Kipp to Fuller's wife was produced. Nor was there any evidence produced aside from Fuller's testimony which indicated that Kipp was unduly familiar with his wife. Fuller makes no direct charges that Kipp was intimate with his wife. He cites circumstances which, unexplained, might afford ground for suspicion. In his divorce action he made general sweeping accusations, but named no persons specifically. His friendship for Kipp, according to his professions, never faltered, notwithstanding the above letter which he claims to have intercepted. His profession of friendship for Kipp is somewhat shattered by the testimony of Mrs. E. L. Frieman, proprietress of the Rolland Hotel, the place at which Mrs. Fuller stopped after she left the defendant and which place was frequented by Fuller. Her testimony in this respect was that after Mrs. Fuller had left her husband Fuller related to her circumstances from which meretricious conduct might be inferred, and Mrs. Frieman said to him, ''Why don't one of you buy the other out if you can't get along'', and Fuller said, ''I think I will buy his interest, and when I buy him out I will have a couple of my gang to take it away from him when I pay it to him.'' Later he said that when Kipp came home late on a particular night that they sat down at the table to have a bite to eat and he, Fuller, laid Kipp's gun and his gun on the table and said, ''Now you tell me whether you have been helping Marjorie or not, and giving her anything, and we will fight it out,'' but Jim would not fight. Whether Fuller in good faith had substantial reason to mistrust Kipp, whose reputation was not impeached in any respect on any element involved in the case, of misconduct with his wife whom he had known for many years, was a question which the court permitted to go to the jury to play whatever part it might in the determination of the guilt and punishment of the defendant. Of course such misconduct, if shown to exist, could not justify the defendant in taking life. The jury evidently was not impressed with the stories told by the defendant, and indeed they were most incredible and when subjected to the test of scrutiny their transparency becomes apparent. In order to build up a ground of justifiable assault upon Kipp, occurring upon the brink of said shaft, the defendant would make it appear that Kipp's eagerness to possess

Fuller's wife, whom he was trying to put away himself and who in turn was trying to get rid of him, furnished a motive for Kipp's conduct as described by Fuller. The jury impliedly found that it was not Kipp's love for Fuller's wife that was the immediate cause of his death, but rather Fuller's desire to enjoy Kipp's property as shown by the case presented.

A number of assignments of error are made both as to the court's ruling on questions of evidence and also as to certain instructions given and refused. Appellant suggests that the record is technically sufficient to sustain the judgment, but that a close case is presented and for that reason a careful inspection should be made of the evidence and instructions to the end that the defendant should be relieved of the extreme penalty should there be discovered any technical violation of his rights. ■ We have read the entire record and find that the evidence most conclusively establishes the guilt of the defendant. The main incriminatory circumstances have not been weakened in the slightest degree by contradictory evidence. In fact, the defense produced no evidence of a credible character which tended to disprove defendant's guilt or rebut the case made against him.

■ Defendant attempted to introduce in evidence certain assignments of property made by Kipp to certain persons other than the defendant, in the early part of 1929. These were excluded. The defendant also offered in evidence an assignment of certain property made by Kipp to the defendant, which was received. The offers of the excluded assignments were made, so it was claimed, for the purpose of showing that decedent made said assignments to one Smith with the intent of hiding his property from his creditors. This transaction and others of a similar import had no materiality whatsoever to the issues involved. What we have said has reference also to all the deeds and mortgages which defendant offered to put in evidence. Such evidence was unquestionably irrelevant and immaterial. In fact the court made no errors in its ruling upon the admissibility of evidence.

■ The jury was fully and correctly instructed on questions of law pertinent to the case. The long approved and now codified instruction (sec. 1096, Pen. Code) defin-

ing reasonable doubt, was given, and the importance of requiring the evidence to satisfy the minds of the jurors on every material fact or issue beyond a reasonable doubt was repeatedly called to the jury's attention.

One instruction given by the court has puzzled us both as to meaning and its applicability to the case. Said instruction reads:

"If the accused was engaged in the performance of an unlawful act, and if the deceased attempted in a lawful manner to prevent the performance of such unlawful act, and if, while so endeavoring to prevent the same, the defendant in anger and solely for the purpose of revenge, or to enable him to carry out his unlawful design so interfered with by said deceased, attacked the latter with a deadly weapon, intending to kill said deceased, and did, under such circumstances, carry such intention into execution, the fact that the defendant was in a passion would not mitigate or excuse such homicide, but the crime committed would in such case be murder in the first degree."

As to just what the thought might have been that prompted this instruction or in what way it may have been regarded as of assistance to the jury in their deliberations, we are wholly unable to make satisfactory answer. It must have been inadvertently given. We have, however, given consideration to the effect that it may have had upon the jury's verdict and have concluded that it could have had none.

No errors appearing in the record which tended to deprive the defendant of a fair and impartial trial, the judgment and order appealed from are affirmed.

Shenk, J., Waste, C. J., Curtis, J., Langdon, J., Tyler, J., *pro tem.*, and Preston J., concurred.

Rehearing denied.